**IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION**

| | | |
|---|---|---|
| LILY YEE, | ) | CASE NO. 1:21-CV-02067 |
| | ) | |
| Plaintiff, | ) | |
| | ) | MAGISTRATE JUDGE |
| v. | ) | CARMEN E. HENDERSON |
| | ) | |
| KILOLO KIJAKAZI, ACTING | ) | **MEMORANDUM OF OPINION AND** |
| COMMISSIONER OF THE SOCIAL | ) | **ORDER** |
| SECURITY ADMINISTRATION, | ) | |
| | ) | |
| Defendant, | | |

**I. Introduction**

Plaintiff, Lily Yee ("Yee" or "Claimant"), seeks judicial review of the final decision of the Commissioner of Social Security denying her application for Disability Insurance Benefits ("DIB"). This matter is before me by consent of the parties under 28 U.S.C. §636(c) and Fed. R. Civ. P. 73. (ECF No. 3). For the reasons set forth below, the Court AFFIRMS the Commissioner's decision.

**II. Procedural History**

On January 15, 2016, Claimant filed an application for DIB, alleging disability beginning November 22, 2015. (ECF No. 6, PageID # 196). The application was denied initially and upon reconsideration, and Claimant requested a hearing before an administrative law judge ("ALJ"). On August 31, 2017, an ALJ held a hearing, during which Claimant, represented by counsel, and an impartial vocational expert testified. (ECF No. 6, PageID #: 68). On April 3, 2018, the ALJ issued

1

an unfavorable disability determination. (ECF No. 6, PageID #: 45). The ALJ's decision became final on October 28, 2018, when the Appeals Council declined further review. (ECF No. 6, PageID #: 19).

Claimant sought judicial review in the United States District Court and pursuant to a joint stipulation of the parties, on May 3, 2019, the Court remanded the claim for further administrative proceedings. (ECF No. 6, PageID #: 1997). On June 28, 2019, the Appeals Council ("AC") remanded the claim to the ALJ.[1] (ECF No. 6, PageID #: 2001). On March 3, 2020, the ALJ held a hearing during which Claimant, represented by counsel, an impartial vocational expert, a medical expert and a psychological expert testified. (ECF No. 6, PageID #: 1953). On March 25, 2020, the ALJ denied Claimant's claims. (ECF No. 6, PageID#: 1928). On September 21, 2021, the AC affirmed the ALJ decision. (ECF No. 6, PageID #: 1922). On November 2, 2021, Claimant filed her Complaint to challenge the Commissioner's final decision. (ECF No. 1). The parties have completed briefing in this case. (ECF Nos. 9, 11). Claimant asserts the following assignment of errors:

    I.    Whether the ALJ erred when he found that the Claimant did not have any mental functional limitations.

(ECF No. 9, PageID #: 2535).

## III. Background

### A. Relevant Hearing Testimony

At the March 3, 2020 hearing, the ALJ noted that the matter was on remand and that the

---

[1] In this remand, the AC noted that on November 28, 2028, Claimant filed a subsequent claim for Title II disability benefits. (ECF No. 6, PageID# 2005). The State agency found Claimant was disabled as of December 6, 2018. (ECF No. 6, PageID# 2005). The AC affirmed this approval, but concluded that the period prior to December 6, 2018 required further adjudication.

Claimant had previously testified at a hearing in August of 2017. (ECF No. 6, PageID #: 1963). Therefore, the ALJ did not question the Claimant and indicated that he would rely on the previous hearing transcript. (ECF No. 6, PageID #: 1963). At the August 2017 hearing, Claimant testified as follows:

- She believed she is disabled because of Lupus.
- The Lupus attacked her organs at any time, which might have led to seizures.
- She experienced one seizure that led her to be hospitalized.
- She suffered from memory lapse about once every couple of days.
- She no longer has difficulty speaking.
- She was dealing with fatigue, she could not stand up more than 30/60 minutes without affecting her lower back, hips, and feet.
- She was laid off by her former employer in 2012 and was unemployed when she was hospitalized and continues to be unemployed for the time period leading up to and through the hearing.
- She suffered from panic attacks caused by heighten levels of stress.

(ECF No. 6, PageID #: 76-80). The ALJ further heard testimony from medical experts Dr. James Washburn and Dr. Linda Miller, which will be further discussed below.

At the 2020 hearing, the ALJ asked the vocational expert to assume:

> [A] hypothetical individual with that past work. I'd further ask you to assume, that the hypothetical individual was limited to the following. The hypothetical individual would fall into the exertional category of light but would have the following further restrictions. The hypothetical individual would be limited to only occasionally using ramps and stairs, never using ladders, ropes, or scaffolds. The hypothetical individual would be limited to occasionally balancing, kneeling, stooping, crouching, and crawling. The hypothetical individual would be restricted from hazards such as heights and machinery, but would be able to avoid ordinary hazards in the workplace such as boxes on the floor, door ajar, or approaching people or vehicles. The hypothetical individual would not be able to operate a motor vehicle during the course of a workday. With those restrictions, would a hypothetical individual be able to perform the past job that we discussed?

(ECF No. 6, PageID #: 1989). The vocational expert testified that the hypothetical person would be able to perform those jobs. (ECF No. 6, PageID #: 1989). The ALJ then asked the vocational

3

expert to assume "the hypothetical individual had the same restrictions as in the first. However, the hypothetical individual would be limited to simple tasks, limited to routine and repetitive tasks." (ECF No. 6, PageID #: 1990). The vocational expert then testified that the hypothetical individual would not be able to perform the Claimant's past jobs either as classified by the DOT or as actually performed, and that there were no transferable skills to other light work. (ECF No. 6, PageID #: 1990).

### B. Relevant Medical Evidence

The ALJ summarized Claimant's symptoms:

> The claimant alleged that she was unable to perform work due to the limiting signs and symptoms associated with her severe impairments. She indicated that she was unable to stand for long periods and that she had problems performing tasks that required lifting heavy items. She reported that she did not go out alone out of concern about getting confused or disoriented. The claimant described limitations with climbing more than two or three flights of stairs, and memory lapses. She noted that it took her longer than before to complete tasks and explained that she could walk no more than half a mile without needing to rest 10 to 15 minutes (4E).
>
> After careful consideration of the evidence, the undersigned finds that the claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record for the reasons explained in this decision.
>
> The claimant experienced signs and symptoms associated with her severe impairments. While there is no evidence in the record from 2013 or 2014, she presented to the emergency department on November 23, 2015 with altered mental status. Her sister reported a similar episode a month prior with symptoms that included confusion and wandering around her neighborhood. Upon admission, testing revealed lactic acidosis, but a head CT scan was negative. She was transferred to intensive care where neurology recommended a 24-hour electroencephalogram (EEG), however, after appearing stable within 24 hours she was transferred to the regular floor where she had a mental status change consistent with a

seizure that was aborted with Ativan. She returned to intensive care, where testing revealed positive anti-double stranded DNA antibodies consistent with a diagnosis of systemic lupus erythematosus. She was treated with Cellcept and high-dose steroids for assessed lupus cerebritis as well as Keppra to manage her seizures, and discharged on December 7, 2015 (1F, 2F/15-276, 3F/3). The claimant was discharged to a rehabilitation facility where she presented as a poor historian and continued to display some confusion upon admission. Treatment included physical therapy, occupational therapy, and speech therapy, and she was discharged in improved condition, to include an independent functional status, on December 19, 2015 (2F/3-14).

The claimant sought treatment for her impairments. On January 4, 2016, she presented for an evaluation with Charles Pavluk, MD on January 4, 2016. Clinical findings were benign, to include a normal gait, no joint swelling, no focal neural deficit, as well as orientation to person, place, and time and a normal mood and affect. Dr. Pavluk indicated that her lupus was improving (9F/234-241). Testing from January 15, 2016 reflect positive anti-double stranded DNA antibodies and positive anti-nuclear antibodies titer that were "very consistent" with lupus as well as an elevated rheumatoid factor (9F/230). A transthoracic echocardiogram from February 11, 2016 showed impaired relaxation pattern of the left ventricular diastolic filling and decreased left ventricular cavity size. However, her left ventricular systolic function was normal with a 60-65 percent ejection fraction. Dr. Pavluk again noted that her lupus was improving (5F/4-6, 9F/216-224).

Treatment for the claimant's impairments continued. She presented for a consultation with Donna Sexton-Cicero, MD on March 21, 2016. She reported some issues of continued forgetfulness, but indicated that she was doing well and feeling almost back to baseline with no major headaches and no significant cognitive problems. She described intermittent paresthesias in both feet, but denied focal numbness, weakness, or major gait/problems. Additionally, the claimant denied any seizure activity since her hospital discharge. Dr. Sexton-Cicero adjusted the claimant's treatment regimen to include hydroxychloroquine and a reduced dosage of prednisone (7F/4-5). During an evaluation with Marek Buczek, MD that same day, the claimant was fully alert, oriented, and appeared in no acute distress. She exhibited decreased sensation to pinprick and temperature in a stocking/glove pattern, but her motor examination, rapid alternating movements, and coordination were all within normal limits. Her gait was stable, and she was able to stand on heels and toes with no difficulty. Tandem walking was somewhat difficult, but a Romberg

test was negative. Dr. Buczek indicated that her sensory loss was consistent with peripheral polyneuropathy that was likely contributing to reported paresthesias with intermittent gait/balance problems and intermittent dizzy spells possibly related to her lupus. However, as the claimant denied any major symptoms related to her central nervous symptoms and the "normal" neurological evaluation, neuroimaging studies of the brain were not warranted at that time. Nonetheless, Dr. Buczek indicated that she should continue treating with Keppra for at least six to 12 months to prevent recurrent seizures (8F).

Treatment for the claimant's impairments remained conservative. Notes form March 31, 2016 reflect that her treatment regimen included hydroxychloroquine, Keppra, Cellcept, Bactrim, and prednisone (6F/14). During an April 15, 2016 evaluation, Dr. Sexton-Cicero indicated that the claimant was tolerating the prednisone taper well. She reported that she continued to feel weak and denied recurrent seizures, joint pain, rashes, or hair loss. She was advised to continue to taper down the medication, and it was indicated that she could stop Bactrim prophylaxis once she was off prednisone completely (9F/39-85). The claimant underwent an evaluation with Dr. Pavluk on May 3, 2016 and reported no concerns. She presented as alert, oriented to person, place, and time, and in no acute distress. Her gait was normal, and she had no joint swelling or focal neurological defects (10F/2-28). On June 14, 2016, the claimant denied recurrent seizures, joint pain, rashes, or hair loss, and Dr. Sexton-Cicero indicated she should stop prednisone and Bactrim as well as reduce her dosage of hydroxychloroquine (12F/48-95). As of September 1, 2016, the claimant denied significant joint pain and indicated that she had no further seizures. She appeared alert, oriented to person, place, and time, and in no acute distress upon examination. She also exhibited no focal neural deficits, synovitis, joint deformities, or skin rashes. Dr. Sexton-Cicero assessed the claimant's lupus as stable (12F/100-147). During her September 27, 2016 follow up, she reported some mild cognitive problems, difficulty with sustained concentration, intermittent joint pain, and some fatigue. However, she reported that she continued to feel well and denied recurrent seizures. Upon examination, she was alert, oriented to person, place, and time, and in no acute distress. She exhibited no focal neurological deficits, synovitis, or skin rashes (12F/152-199).

…

Treatment for the claimant's impairments continued. During her December 1, 2016 evaluation with Dr. Sexton-Cicero, she continued

6

to report some mild cognitive problems with difficulty with sustained concentration, intermittent joint pain, and some fatigue. However, she indicated she felt well and that she had not had any recurrent seizures. Clinical findings remained benign. She was alert, oriented to person, place, and time, and appeared in no acute distress. She exhibited no focal neurological deficits, no synovitis, and no rashes. No changes were made to her treatment regimen (14F/5-52). On January 4, 2017, the claimant underwent an evaluation with Dr. Pavluk. Upon examination, she was alert, oriented to person, place, and time, and in no acute distress. Her gait was normal, and she exhibited no joint swelling or focal neurological deficits (15F/49-99). During a neurological evaluation with Dr. Buczek on February 20, 2017, the claimant indicated that she was more forgetful, but denied any major headaches or significant cognitive problems. She also denied any seizure activity since her hospitalization but expressed disinterest in discontinuing her Keppra for fear of seizure recurrence. She appeared alert, fully oriented, and in no acute distress. Neurological and physical findings were noted to be unchanged since her last evaluation, to included stable coordination, gait, and rapid alternating movements. Dr. Buczek indicated that she was experiencing improving headaches along with constitutional and pain symptoms. Tapering of Keppra was recommended (17F/1-49). Treatment notes from an evaluation with Dr. Sexton-Cicero on March 13, 2017 reflect continued reports of mild cognitive problems and difficulties with sustained concentration. However, she denied joint pain, rashes, or recurrent seizures. She appeared alert, oriented to person, place, and time, and was in no acute distress. Additionally, she exhibited no focal neurological deficits, synovitis, or rashes. Dr. Sexton-Cicero assessed that the claimant was "currently doing well" with her lupus (15F/1-48, 18F/52-99).

The evidence supports no sustained worsening in the signs and symptoms associated with the claimant's severe impairments. She presented for an evaluation of her seizure medication with Tanvir Syed, MD on March 15, 2017. She reported experiencing no seizures since her hospitalization, and denied staring spells, memory lapses, disorientation, confusion, or walking up with urinary incontinence. The claimant appeared in no acute distress, and was alert, interactive, and oriented to person, place, and time. Her recent and remote memory were intact, and she demonstrated normal attention span and concentrating ability. Her muscle strength was 5/5 throughout, her sensation was intact to light touch, and her gait was normal with a normal stance. Dr. Syed indicated that as her seizure was caused by lupus cerebritis, a physical substrate, the claimant should remain on Keppra for five years after which she

7

> could taper down in the absence of recurrent seizure activity (16F/10-43). On June 12, 2017, she exhibited erythematous plaques on her upper chest with a slight overlying scale. However, she was alert, oriented to person, place, and time, and in no acute distress. She also showed no focal neurological deficits or synovitis. Dr. Sexton-Cicero prescribed hydrocortisone cream for what was noted to be cutaneous lupus on her upper chest. However, no other changes were made to her treatment regimen (18F/1-51).

(ECF No. 6, PageID #: 1939-1942).

### C. Opinion Evidence

The ALJ considered opinions from several medical experts: 1) Dr. Donna Sexton-Cicero, Claimant's treating rheumatologist; 2) Dr. Charles Pavluk, Claimant's treating primary care provider; 3) Dr. Deborah Koricke, consultative examining physician; 4) Dr. Linda Miller, a psychiatrist; 5) Dr. James Washburn, internist; and 6) Dr. Leigh Thomas and Dr. Joseph Edwards, state agency reviewing physicians.

> Dr. Sexton-Cicero completed a functional assessment for the claimant on September 27, 2016. She indicated that she could occasionally lift up to 10 pounds and frequently lift up to five pounds due to joint pain secondary to his lupus. She could stand/walk a total of three hours in an eight-hour workday for no more than one hours at a time due to her fatigue. She could sit no more than six hours in a workday for no more than one-hour in a workday due to pain and fatigue. The claimant could rarely climb, balance, stoop, crouch, kneel, and crawl due to pain, fatigue, and her seizure disorder. She could occasionally reach, as well as rarely push/pull and perform fine/gross manipulation due to joint pain and fatigue. She had environmental limitations for heights, moving machinery, temperature extremes, pulmonary irritants, and noise due to her seizure disorder. The claimant experienced a mild level of pain that interfered with her concentration, took her off task, caused absenteeism. She required the ability to lift her legs to 45 degrees at will and would require one additional unscheduled break during the workday. Finally, the claimant's seizure disorder, mild cognitive issues, and trouble concentrating/focusing would additionally interfere with working eight hours a day, five days a week (11F).

8

> Dr. Pavluk completed a functional assessment for the claimant on September 29, 2016. She could lift/carry no more than 10 pounds occasionally due to pain and tenderness. She had no standing/walking or sitting limitations but could rarely climb due to her lupus with impaired cognitive functioning. The claimant had environmental restrictions for heights, moving machinery, temperature extremes, pulmonary irritants, and noise due to "significant" cognitive issues which caused imbalance and her seizures increased risks for falls. Finally, the claimant's level of pain interfered with the claimant's ability to concentrate and she would require an unspecified number of unscheduled breaks during a workday (13F).
>
> …
>
> Dr. Pavluk completed a functional assessment for the claimant on August 2, 2017. She was limited to occasionally carrying no more than 10 pounds occasionally, and she was limited to standing/walking no more than one hour due to extremity pain. She could no more than rarely climb and could no more than occasionally balance, stoop, crouch, and kneel. The claimant could no more than rarely reach, push/pull, and perform fine/gross manipulation. She had environmental restrictions for heights, moving machinery, temperature extremes, and noise due to her seizures. She had pain that interfered with concentration, would take her off task, and would cause absenteeism. Finally, she required an additional one hour unscheduled break in a workday (21F). The record contains no additional evidence prior to December 6, 2018.
>
> At the hearing, the medical expert, James Washburn, DO, testified that the claimant's impairments included systemic lupus and one instance of lupus cerebritis. Since that time, she experienced no recurrent seizures, and her symptoms of polyneuropathy and headaches improved over time. Follow-ups with her rheumatologist repeatedly stated that there was no joint pain or rashes. Her major complaints were difficulty concentrating and multitasking, but no physical manifestations of active lupus. He opined that based on the evidence of the record, her lupus would not meet or medically equal listing 14.02. Due to likely weakness, he would limit the claimant to lifting 10 pounds frequently and 20 pounds occasionally. Additionally, due to the risk of seizure activity, she should avoid ladders, scaffolding, unprotected heights, mechanical machinery, and commercial driving.

(ECF No. 6, PageID #: 1941-1944).

## IV. The ALJ's Decision

The ALJ made the following findings relevant to this appeal:

4. Through the date last insured, the claimant did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525 and 404.1526).

5. After careful consideration of the entire record, the undersigned finds that, through December 5, 2018, the claimant had the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) except can occasionally use ramps and stairs, but can never use ladders, ropes, or scaffolds. The claimant can occasionally balance, kneel, stoop, crouch, and crawl. Restricted from hazards such as heights or machinery, but is able to avoid ordinary hazards in the workplace, such as boxes on the floor, doors ajar, or approaching people or vehicles. Never required to operate a motor vehicle during the course of a workday.

6. Through the date last insured, the claimant was capable of performing past relevant work as a General Clerk. This work did not require the performance of work-related activities precluded by the claimant's residual functional capacity (20 CFR 404.1565).

7. The claimant was not under a disability, as defined in the Social Security Act, at any time from December 31, 2013, the alleged onset date, through December 5, 2018 (20 CFR 404.1520(f)).

## V. Law & Analysis

### A. Standard of Review

The Court's review "is limited to determining whether the Commissioner's decision is supported by substantial evidence and was made pursuant to proper legal standards." *Winn v. Comm'r of Soc. Sec.*, 615 F. App'x 315, 320 (6th Cir. 2015); *see also* 42 U.S.C. § 405(g). "[S]ubstantial evidence is defined as 'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (quoting *Cutlip v. Sec'y of HHS*, 25 F.3d 284, 286 (6th Cir. 1994)).

10

"After the Appeals Council reviews the ALJ's decision, the determination of the council becomes the final decision of the Secretary and is subject to review by this Court." *Olive v. Comm'r of Soc. Sec.*, No. 3:06 CV 1597, 2007 WL 5403416, at *2 (N.D. Ohio Sept. 19, 2007) (citing *Abbott v. Sullivan*, 905 F.2d 918, 922 (6th Cir. 1990); *Mullen v. Bowen*, 800 F.2d 535, 538 (6th Cir. 1986) (*en banc*)). If the Commissioner's decision is supported by substantial evidence, it must be affirmed, "even if a reviewing court would decide the matter differently." *Id.* (citing 42 U.S.C. § 405(g); *Kinsella v. Schweiker*, 708 F.2d 1058, 1059–60 (6th Cir. 1983)).

### B. Standard for Disability

The Social Security regulations outline a five-step process that the ALJ must use in determining whether a claimant is entitled to supplemental-security income or disability-insurance benefits: (1) whether the claimant is engaged in substantial gainful activity; (2) if not, whether the claimant has a severe impairment or combination of impairments; (3) if so, whether that impairment, or combination of impairments, meets or equals any of the listings in 20 C.F.R. § 404, Subpart P, Appendix 1; (4) if not, whether the claimant can perform her past relevant work in light of her residual functional capacity ("RFC"); and (5) if not, whether, based on the claimant's age, education, and work experience, she can perform other work found in the national economy. 20 C.F.R. § 404.1520(a)(4)(i)–(v); *Combs v. Comm'r of Soc. Sec.*, 459 F.3d 640, 642–43 (6th Cir. 2006). The claimant bears the ultimate burden of producing sufficient evidence to prove that she is disabled and, thus, entitled to benefits. 20 C.F.R. § 404.1512(a). Specifically, the claimant has the burden of proof in steps one through four. *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997). The burden shifts to the Commissioner at step five to establish whether the claimant has the residual functional capacity to perform available work in the national economy. *Id.*

### C. Discussion

The Claimant states that the ALJ erred when he assigned Ms. Yee a residual functional capacity that did not include any mental functional limitations, (ECF No. 6, PageID #: 1920, 1921) arguing that "all of the medical sources of record are in agreement that her lupus [limited her] mental functional capacity." (ECF No. 9, PageID #: 2535-2537).

Claimant asserts that the ALJ "cherry picked" the evidence to support the RFC, rather than addressing the evidence as a whole. (ECF No. 9, PageID #: 2535-2536). The Sixth Circuit has explained that a cherry-picking "allegation is seldom successful because crediting it would require a court to re-weigh record evidence." *DeLong v. Comm'r of Soc. Sec. Admin.*, 748 F.3d 723, 726 (6th Cir. Apr. 3, 2014) (citing *White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 284 (6th Cir. 2009) (finding "little indication that the ALJ improperly cherry picked evidence; the same process can be described more neutrally as weighing the evidence.")); *accord Hammett v. Comm'r of Soc. Sec.*, No. 16-12304, 2017 U.S. Dist. LEXIS 146914, 2017 WL 4003438, at *3 (E.D. Mich. Sept. 12, 2017); *Cromer v. Berryhill*, No. CV 16-180-DLB, 2017 U.S. Dist. LEXIS 66332, 2017 WL 1706418, at *8 (E.D. Ky. May 2, 2017); *Anderson v. Berryhill*, No. 1:16CV01086, 2017 U.S. Dist. LEXIS 51160, 2017 WL 1326437, at *13 (N.D. Ohio Mar. 2, 2017), *report and recommendation adopted*, 2017 U.S. Dist. LEXIS 51156, 2017 WL 1304485 (N.D. Ohio Apr. 3, 2017).

To the contrary, it is the responsibility of the ALJ to resolve the conflicts in the record where there are conflicting opinions resulting from essentially the same medical data. *See, e.g., Martin v. Comm'r of Soc. Sec.*, 170 Fed. App'x 369, 373 (6th Cir. 2006) ("The ALJ had the duty to resolve conflicts in medical evidence"); *Crum v. Sullivan*, 921 F.2d 642, 645 (6th Cir. 1990); see generally *Webb v. Commissioner*, 368 F.3d 629, 633 (6th Cir. 2004) (ALJ's responsibility to evaluate medical evidence and claimant's testimony to assess RFC). "It is the duty of the ALJ, as

12

the trier of fact, to resolve conflicts in the medical evidence." *Hensley v. Astrue*, No. 12-106, 2014 U.S. Dist. LEXIS 33135, 2014 WL 1093201 at *4 (E.D. Ky. Mar. 14, 2014) citing *Richardson v. Perales*, 402 U.S. 389, 399, 91 S. Ct. 1420, 28 L. Ed. 2d 842 (1971)). "It is the ALJ's place, and not the reviewing court's, to resolve conflicts in evidence." *Collins v. Comm'r of Soc. Sec.*, 357 F. App'x 663, 670 (6th Cir. 2009) (citations omitted).

Here, the ALJ did not "cherry pick" evidence to support the RFC. The ALJ explained that "the overall evidence supports no more than mild signs and symptoms associated with the claimant's mental impairments. Specifically, clinical findings reflect a normal/appropriate mood and affect, normal judgment and insight, intact recent and remote memory, normal attention span and concentrating ability, and normal language comprehension." (ECF No. 6, PageID #: (citing Exhibits 8F/8, 9F/71, 9F/180, 9F/216, 10F/26, 12F/33, 12F/80, 12F/133, 14F/37, 15F/33, 15F/82, 15F/132, 16F/42, 17F/33, 18F/33, 18F/84, 18F/132, 19F/2, 22F/35, 23F/41, 23F/92, 24F/41, 25F/42)). Notably, the ALJ agreed that Claimant's mental functioning was limited for a short time following her seizure in November of 2015 but that her limitations did not persist following rehabilitation. The ALJ explained:

> The record does not reflect that her confusion persisted after her hospitalization and rehabilitation, with findings that include orientation to person, place, and person, a fully alert presentation, intact recent and remote memory, as well as normal attention span and concentrating ability (8F, 10F/2-28, 12F/100-147, 12F/152-199, 14F/5-52, 15F/49-99, 16F/10-43, 17F/1-49, 18F/1-51, 18F/52-99). There is no evidence of a recurrent seizure activity since her hospitalization (7F/4-5, 9F/39-85, 12F/100-147, 12F/152-199, 14F/5-52, 16F/10-43, 17F/1-49, 18F/52-99). Clinical findings reflect 5/5 strength, a normal gait, stable coordination, no joint swelling/deformities, no focal neural deficit, no synovitis, and no skin rashes (9F/234- 241, 10F/2-28, 12F/100-147, 12F/152-199, 14F/5-52, 15F/49-99, 16F/10-43, 17F/1-49, 18F/52- 99). Further, her lupus was assessed as improving, stable, and/or "doing well" (5F/4-6, 9F/216- 224, 9F/234-241, 12F/100-147, 15F/1-48, 18F/52-99).

13

(ECF No. 6, PageID #: 1942). The ALJ supported his conclusion that Claimant's mental limitations did not persist beyond February 2016 by citing to objective clinical findings from March 2016 to November 2019. Claimant fails to point to any clinical findings dated after February 2016 that the ALJ overlooked. Instead, Claimant relies on her subjective complaints to doctors and her hearing testimony. (*See* ECF No. 9 at 18). However, "an ALJ is not required to accept a claimant's subjective complaints and may properly consider the credibility of a claimant when making a determination of disability." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 476 (6th Cir. 2003). The ALJ found that "the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record" (ECF No. 6, PageID #: 1939) and that the "level of limitation alleged is not altogether supported by the objective findings" (ECF No. 6, PageID #: 1943). Yee does not challenge the ALJ's credibility determination. Here, the ALJ reasonably discounted Claimant's subjective complaints as inconsistent with the evidence. (ECF No. 6, PageID #: 1939-1943).

Claimant also argues that the ALJ improperly substituted his own judgment in lieu of the opinions of qualified medical experts. (ECF No. 9 at 15). "The responsibility for determining a claimant's residual functional capacity rests with the ALJ, not a physician." *Poe v. Comm'r of Soc. Sec.*, 342 F. App'x 149, 157 (6th Cir. 2009) (citing 20 C.F.R. §§ 404.1546(c), 416.946(c)). "Although the ALJ may not substitute his opinion for that of a physician, he is not required to recite the medical opinion of a physician verbatim in his residual functional capacity finding." *Id*. (citing 20 C.F.R. §§ 404.1545(a)(3), 416.945(a)(3)). "Moreover, an ALJ does not improperly assume the role of a medical expert by assessing the medical and non-medical evidence before rendering a residual functional capacity finding." *Id*. (citing *Ford v. Comm'r of Soc. Sec.*, 114 Fed. Appx. 194, 197 (6th Cir. 2004).

Here, the ALJ thoroughly examined all the evidence and properly explained why he rejected the findings of each of the medical experts. (ECF No. 9, PageID #: 2535-2537). The ALJ stated that Dr. Sexton-Cicero's opinion regarding Claimant's level of mental limitation was "not consistent with the objective findings." (ECF No. 6, PageID #: 1944). The ALJ explained that

> The record fails to support recurrent seizure activity, and despite reported cognitive limitations, treatment notes reflect intact recent and remote memory, normal attention span and concentrating ability, orientation to person, place, and time, as well as a fully alert presentation (8F, 10F/2-28, 12F/100-147, 12F/152-199, 14F/5-52, 15F/49-99, 16F/10-43, 17F/1-49, 18F/1-51, 18F/52-99). Further, Dr. Sexton-Cicero outlined that claimant was "doing well" with her lupus or that the impairment was stable (12F/100-147, 15F/1-48, 18F/52-99).

(ECF No. 6, PageID #: 1944).

Similarly, the ALJ explained that Dr. Pavluk's opined mental limitations were not consistent with the overall evidence: "As outlined above, there is no evidence of recurrent seizure activity since her hospitalization, to include staring spells, memory lapses, disorientation, confusion, or walking [sic] up with urinary incontinence (7F/4-5, 9F/39-85, 12F/100-147, 12F/152-199, 14F/5-52, 16F/10-43, 17F/1-49, 18F/52-99)." (ECF No. 6, PageID #: 1944). The ALJ further noted that "the opinion of Dr. Pavluk is … not supported by the objective findings summarized. Further, as an internist, Dr. Pavluk lacked the specialist knowledge to opine on the claimant's mental functioning." (ECF No. 6, PageID #: 1937).

The ALJ also explained that Dr. Koricke and Dr. Pavluk's opinions were not supported by the medical record which "supports no more than mild signs and symptoms associated with the claimant's mental impairments. Specifically, clinical findings reflect a normal/appropriate mood

and affect, normal judgment and insight, intact recent and remote memory, normal attention span and concentrating ability, and normal language comprehension[.]" (ECF No. 6, PageID #: 1936 (citing 8F/8, 9F/71, 9F/180, 9F/216, 10F/26, 12F/33, 12F/80, 12F/133, 14F/37, 15F/33, 15F/82, 15F/132, 16F/42, 17F/33, 18F/33, 18F/84, 18F/132, 19F/2, 22F/35, 23F/41, 23F/92, 24F/41, 25F/42)). The ALJ noted that Dr. Koricke's opinion "was based on a one-time evaluation not long after her acute illness, reliant on the claimant's self-reports, and inconsistent with her lack of mental health treatment and the previously summarized benign findings." (ECF No. 6, PageID #: 1937).

The ALJ explained that opinions of the State agency psychological consultants, Drs. Edwards and Tishler were not supported by the overall findings because:

> As outlined below, the claimant experienced significant cognitive deficits secondary to lupus cerebritis. However, the evidence does not reflect that the effects persisted beyond the acute episode. There is no evidence of specialized mental health treatment or psychoneurological testing to confirm reported cognitive deficits. Additionally, clinical findings reflect normal/appropriate mood and affect, normal judgment and insight, intact recent and remote memory, normal attention span and concentrating ability, and normal language comprehension (8F/8, 9F/71, 9F/180, 9F/216, 10F/26, 12F/33, 12F/80, 12F/133, 14F/37, 15F/33, 15F/82, 15F/132, 16F/42, 17F/33, 18F/33, 18F/84, 18F/132, 19F/2, 22F/35, 23F/41, 23F/92, 24F/41, 25F/42).

(ECF No. 6, PageID #: 1937).

Claimant incorrectly states that "the ALJ failed to address the testimony of the psychiatrist who testified … Dr. Miller." (ECF No. 9 at 16). With respect to Dr. Miller's opinion, the ALJ stated:

> At the hearing, the medical expert, Linda Miller, DO, testified that the claimant's has an autoimmune disorder that caused an acute inflammation of her brain. At the time of the incident, she was completely mentally incapacitated with extreme to marked limitations, and required significant medical intervention. It can

16

> take a while to heal from such an incident. In looking at the psychological consultative examination, Dr. Miller indicated the claimant's diagnoses included adjustment disorder with mixed anxiety and depressed mood and avoidant personality disorder. She also indicated that the claimant was able to provide quite a bit of history and the clinical evidence did not reflect a serious level of symptoms. Therefore, the cognitive impact of her lupus cerebritis had resolved at that time to a significant extent such that she would not require a marked or extreme limitation in any of the "B" criteria. Subsequent to the consultative examination, there was insufficient data to provide what degree of limitation she experienced.
>
> …
>
> Finally, the undersigned takes note of the testimony of Dr. Miller. However, given the lack of the psychological evidence in the record, she was unable to provide a complete assessment of the claimant's functioning for the entire period under review. Nonetheless, the undersigned affords some weight to her finding that the claimant's presentation at the consultative examination was indicative of an improvement in her overall functioning given the level of personal history provided. This is consistent with clinical findings elsewhere in the record that showed intact recent and remote memory, normal attention span and concentrating ability, a normal/appropriate mood and affect, normal judgment and insight, and normal language comprehension (8F/8, 9F/71, 9F/180, 9F/216, 10F/26, 12F/33, 12F/80, 12F/133, 14F/37, 15F/33, 15F/82, 15F/132, 16F/42, 17F/33, 18F/33, 18F/84, 18F/132, 19F/2, 22F/35, 23F/41, 23F/92, 24F/41, 25F/42).

(ECF No. 6, PageID #: 1935-38).

Finally, the ALJ detailed his reasons, including citations to objective clinical findings, for determining that Claimant's limitations did not persist following rehabilitation:

> The evidence reflects that the claimant experienced limiting signs and symptoms associated with her severe impairments. She required hospitalization for confusion, during which time she exhibited a mental status change consistent a seizure. Findings were consistent with a diagnosis of lupus and associated lupus cerebritis, to include positive anti-double stranded DNA antibodies (1F, 2F/15-276, 3F/3). Subsequent findings revealed an elevated rheumatoid factor as well as positive anti-double stranded DNA antibodies and positive anti-nuclear antibodies titer that were "very consistent"

17

>with lupus (9F/230). She described forgetfulness, intermittent paresthesias in both feet, weakness, mild cognitive problems, difficulty with sustained concentration, and intermittent joint pain (7F/4-5, 9F/39-85, 12F/152-199, 14F/5-52, 15F/1-48, 17F/1-49, 18F/52- 99). Significant clinical findings included being a poor historian, confusion, decreased sensation to pinprick and temperature in a stocking/glove pattern, difficulty with tandem walking, as well as erythematous plaques on her upper chest with a slight overlying scale (2F/3-14, 8F, 17F/1-49, 18F/1-51).
>
>However, the claimant's statements about the intensity, persistence, and limiting effects of her symptoms are inconsistent because the level of limitation alleged is not altogether supported by the objective findings. The record does not reflect that her confusion persisted after her hospitalization and rehabilitation, with findings that include orientation to person, place, and person, a fully alert presentation, intact recent and remote memory, as well as normal attention span and concentrating ability (8F, 10F/2-28, 12F/100-147, 12F/152-199, 14F/5-52, 15F/49-99, 16F/10-43, 17F/1-49, 18F/1-51, 18F/52-99). There is no evidence of a recurrent seizure activity since her hospitalization (7F/4-5, 9F/39-85, 12F/100-147, 12F/152-199, 14F/5-52, 16F/10-43, 17F/1-49, 18F/52-99). Clinical findings reflect 5/5 strength, a normal gait, stable coordination , no joint swelling/deformities, no focal neural deficit, no synovitis, and no skin rashes (9F/234- 241, 10F/2-28, 12F/100-147, 12F/152-199, 14F/5-52, 15F/49-99, 16F/10-43, 17F/1-49, 18F/52- 99). Further, her lupus was assessed as improving, stable, and/or "doing well" (5F/4-6, 9F/216- 224, 9F/234-241, 12F/100-147, 15F/1-48, 18F/52-99).

(ECF No. 6, PageID #: 1943).

The above clearly illustrates that the ALJ fully explained his basis for resolving conflicts in the record.[2] Here, the ALJ adequately articulated his reasons for not including mental functional

---

[2] Claimant's reliance on *Heston v. Comm'r of Social Security,* 245 F.3d 528, 535 (6th Cir. 2001), is misplaced. Claimant cites to *Heston* as support for her argument that the ALJ improperly "opted for a piecemeal approach" when explaining his reasons for not including a mental limitation in the RFC. (ECF No. 9 at 15). *Heston*, however, speaks to the *court's* role upon *review* of an ALJ's decision. *Id.* ("the *court* may review [an expert's] report [that was not cited to by the ALJ], in its consideration of the record as a whole, to determine if the ALJ's decision was based upon substantial evidence[.]") (emphasis added). *Heston* does not state that an ALJ errs by separately explaining his reasons for not adopting multiple expert opinions. Instead, *Heston* simply held that

18

limitations into the RFC. Claimant simply disagrees with the ALJ's reasoning. "This court's role in considering a social security appeal, however, does not include reviewing the evidence de novo, making credibility determinations, or reweighing the evidence." *Bankert v. Saul*, No. 5:18-CV-2016, 2019 WL 4736489, at *8 (N.D. Ohio Sept. 27, 2019) (citing *Brainard v. Sec'y of Health & Hum. Servs.*, 889 F.2d 679, 681 (6th Cir. 1989)). Here, the ALJ's decision not to include mental functional limitations in the RFC is supported by substantial evidence. Accordingly, the Court finds no reason to disturb the ALJ's decision.

## VI. Conclusion

Based on the foregoing, the Court AFFIRMS the Commissioner's final decision denying Claimant benefits.

**IT IS SO ORDERED.**

DATED: January 6, 2022

*s/ Carmen E. Henderson*
CARMEN E. HENDERSON
UNITED STATES MAGISTRATE JUDGE

---

an ALJ's error in failing to reference a treating physician's expert opinion may be harmless error in view of the record as a whole. *Id.* at 536.